The PEOPLE of the State of Colorado, Plaintiff–Appellee,

v.

Antonio M. MEDINA, Defendant–Appellant.

No. 99CA0980.

Colorado Court of Appeals, Div. V.

June 21, 2001.

Rehearing Denied Sept. 6, 2001.*

Certiorari Granted July 22, 2002.

Ken Salazar, Attorney General, Lauren A. Edelstein, Assistant Attorney General, Denver, CO, for Plaintiff–Appellee.

David S. Kaplan, Colorado State Public Defender, Dana Nichols, Deputy State Public Defender, Kathleen Lord, Deputy State Public Defender, Denver, CO, for Defendant–Appellant.

Opinion by Judge ROTHENBERG.

Defendant, Antonio M. Medina, appeals the judgment of conviction entered on a jury verdict finding him guilty of second degree murder. We affirm.

According to the prosecution's evidence, defendant attended a party on August 29, 1996. There was evidence that defendant left the party with the victim, her boyfriend, and another man, that they walked to a nearby park, and that the victim agreed to have sex with defendant there while her boyfriend watched. The other man left.

The boyfriend testified that: (1) defendant was unable to obtain an erection and the victim had laughed at him; (2) after the attempted sex, he, defendant, and the victim had walked to the boyfriend's home; (3) defendant and the victim continued to walk together; and (4) everything appeared normal at that time.

That was the last time the victim was seen alive.

The prosecution also called defendant's wife as a witness. She testified that on the day after the party, when she awoke defendant was gone. He called her a few hours later from an auto body shop and said he needed a cab. When he returned home in the cab, he told her there had been "an accident and that a girl was killed." According to the wife:

> [Defendant] said they were at a party and the girl was asking for money, and she kept hitting him in the chest and he was trying to walk away, and he told her to get out of his face, and he had finally had enough, and then he punched her in the throat, and she fell down, and he left [the party].

The wife testified that defendant also said he had left the body in a park and then had taken it to another location and had left it there. He reported that their car had become stuck in the mud near where he had left the victim's body, and he insisted that the wife accompany him to help retrieve it. The wife helped him rent a chainsaw to free the vehicle, and she saw the body.

She further testified that defendant left their house several times in the middle of the night to check on the body and that he later moved the body several times.

Defendant gave his wife other versions of the events. He told her he had hit "the girl" in the throat at the party, and when he did so, "[h]e pulled back her hair and punched her in the throat," and then heard her neck "pop and crack." He said that after hitting her, he had left her at the party, and "some

other guys had taken her into the house, and he had left."

In another version, he told her that he had gotten into a fight at the party, that the victim had tried to break up the fight, and that she got "pushed" and fell down and hit her head. In still another version, he said that the victim had asked him for $100 in exchange for sex, that he was unable to pay that amount, that they got into an argument, that he hit her in the chest, and that she fell down and hit her head.

The prosecution called four witnesses who were at the party, and none reported observing a fight or any type of altercation at the party.

In addition to the wife's testimony regarding what defendant had told her, she also testified that: (1) he began to have insomnia and to experience nightmares over the killing; (2) two weeks after the homicide, he insisted that they move to New Mexico; and (3) while in New Mexico, he became suspicious of her phone calls, listened to her conversations, constantly kept her near him, and even brought her to work with him at times.

The wife eventually called her mother, who in turn alerted the police. Shortly thereafter, defendant and his wife returned to Colorado, and the police set up a surveillance operation. Several police investigators testified at trial that they saw defendant travel to a remote location, get out of his vehicle, look around, and then leave. Investigators later exhumed the victim's body from the same area and arrested defendant.

On the morning of trial, the People moved to admit evidence from defendant's wife that defendant had phoned her from jail. According to the wife, defendant told her she held his life in her hands and she was the only person who could get him out of the situation. He urged her to change her story, to refuse to testify at trial, and to say that the police had frightened her into lying at the preliminary hearing. The People contended this evidence was admissible under CRE 404(b) or as *res gestae*, and over defendant's objection, the trial court admitted the evidence under both theories. The court instructed the jury that the evidence should

only be considered to show "absence of mistake and absence of accident."

The pathologist testified that he could not pinpoint the victim's cause of death because her body was so deteriorated at the time of the autopsy that her internal organs had liquified, and the body was too decomposed to reveal bruises on her neck. The pathologist also testified on direct examination that the victim could *not* have died from a fall hitting her head or from "a severe jerking to her neck such as being pulled by the hair," but that it was possible she died from a very hard blow to her neck or from a very hard push or shove to her chest area by a "commando chop or a commando blow [to the neck]." On cross-examination, however, the pathologist stated that the blow did not have to be hard to be fatal.

I.

■ Defendant first contends the trial court abused its discretion in denying his motion to dismiss based on outrageous governmental conduct. We disagree.

■ Colorado recognizes the due process claim of outrageous governmental conduct. *Bailey v. People*, 630 P.2d 1062 (Colo. 1981). Outrageous governmental conduct is conduct that violates fundamental fairness and is shocking to the universal sense of justice. *People v. Johnson*, 987 P.2d 855 (Colo.App.1998).

■ Whether the circumstances presented bar prosecution under principles of due process is for the trial court to determine based upon the totality of facts in a given case. *People v. Aponte*, 867 P.2d 183 (Colo.App. 1993). This determination lies within the trial court's discretion and will not be overturned on appeal absent an abuse of that discretion. *People in Interest of M.N.*, 761 P.2d 1124 (Colo.1988).

■ An abuse of discretion occurs where the trial court's ruling is manifestly arbitrary or unreasonable. *People v. Czemerynski*, 786 P.2d 1100 (Colo.1990).

In *People v. Auld*, 815 P.2d 956 (Colo.App. 1991), on which defendant heavily relies, law enforcement officials conducted·undercover

activities aimed at drug trafficking and also targeted the defendant, who was an attorney. Government agents filed a fictitious complaint in court against a "Colton Young," which was the alias of an undercover agent. "Defendant Young" was charged with a fictitious crime, brought before the court, and made several false statements to the judge. The judge was unaware of Young's true identity. Young then retained the attorney who was the target of this sting operation.

When the attorney later was arrested for theft by receiving and possession of a dangerous weapon, the district attorney offered to dismiss the charges if the attorney provided information about a number of persons, including present or former clients. He refused and moved to dismiss the information based on alleged outrageous governmental conduct.

The trial court granted the motion, and a division of this court affirmed. The division agreed with the trial court that dismissal was an appropriate remedy because law enforcement officials had implicated the court in law enforcement activities, and the integrity of the court had been compromised.

In contrast, here, the court found that the conduct of the law enforcement authorities had been inappropriate, but concluded it was not so outrageous as to violate fundamental due process. The court found that police officers had acted improperly by: (1) failing to advise defendant of his *Miranda* rights; (2) failing to determine whether he understood his right to counsel; (3) continuing to interrogate defendant after he had invoked his right to counsel; (4) failing to determine whether he was represented by counsel before interviewing him; and (5) engaging in coercive police conduct by making promises and threats to defendant.

However, after examining the totality of the circumstances, and taking into account the need to balance the rights of defendants with the state's authority to bring criminal prosecutions against those alleged to have committed crimes, the trial court concluded the proper remedy was suppression of defendant's statements to the police. By suppressing the statements attained through the officers' inappropriate behavior, the court ef-fectively maintained the fundamental fairness of the proceedings.

Unlike the circumstances in *Auld*, the integrity of the court was not compromised here, and the conduct of the law enforcement authorities did not impair defendant's ability to prepare or present his defense. Accordingly, we perceive no abuse of discretion by the trial court in denying defendant's motion to dismiss for outrageous governmental conduct.

## II.

Defendant next contends the trial court erred in admitting the wife's testimony about his phone call from jail. We conclude that the testimony regarding defendant's statements was not properly admitted as part of the *res gestae*, but that it was admissible under CRE 404(b).

### A.

 *Res gestae* evidence provides the factfinder with a complete understanding of the events surrounding the crime and the context in which the crime occurred, including events closely related in time and nature to the charged offense. *Res gestae* evidence is not subject to the general rule of CRE 404(b) that excludes evidence of prior criminality. *People v. Quintana*, 882 P.2d 1366 (Colo.1994).

 Evidence that is not contemporaneous with the crime charged and does not illustrate its character is not part of the *res gestae*. *See People v. Frost*, 5 P.3d 317 (Colo.App.1999) (defendant's statements relating to other acts were not *res gestae* because they were made several months after the alleged offense). Thus, because the statements defendant made to his wife occurred more than two years after the crime and, even if true, implicated him in the separate crime of witness tampering, they cannot be characterized as part of the *res gestae*. *See People v. Frost, supra*.

### B.

 Evidence of other crimes, wrongs, or acts is generally inadmissible to prove a wit-

ness's character or show his or her propensity for such conduct. However, it may be admitted under CRE 404(b) for other purposes, such as to show the absence of mistake or accident or to show consciousness of guilt. *People v. Adams*, 867 P.2d 54 (Colo. App.1993).

■ Trial courts have substantial discretion in determining the admissibility of similar transaction evidence, and a reviewing court will not overturn that ruling absent an abuse of that discretion. *People v. Frost, supra.*

■ Before evidence of other acts is admissible, the prosecution must show that: (1) the evidence relates to a material fact; (2) the evidence has logical relevance in that it adds to the probability that the material fact is true; (3) the logical relevance of the evidence does not depend on an intermediate inference that the litigant has a bad character, which would be employed to support a further inference that the litigant acted in conformity with his bad character; and (4) the probative value of the evidence is not substantially outweighed by the evidence's prejudicial impact. *People v. Spoto*, 795 P.2d 1314 (Colo.1990).

■ Here, the trial court admitted defendant's statements to his wife under CRE 404(b) to show the absence of accident and mistake. The People do not urge that rationale on appeal. Nevertheless, they maintain that the evidence was admissible to show the defendant's consciousness of guilt and that the court's ruling should be upheld on that basis. *See People v. Quintana, supra* (a trial court's ruling will not be reversed if it reached a correct result, albeit by an incorrect analysis).

We agree the evidence was admissible under CRE 404(b) to show defendant's consciousness of guilt because it showed his knowledge of the crime as well as his attempt to conceal his role in the victim's death by persuading his wife not to testify. Nor was the probative value of the evidence substantially outweighed by the evidence's prejudicial impact, especially given the trial court's limiting instruction to the jury. Therefore, we conclude the court did not abuse its discretion in admitting the wife's testimony under CRE 404(b).

### III.

Defendant next contends the trial court erred in denying his motion for acquittal of second degree murder on the ground that the evidence was insufficient to sustain a verdict on that charge. We are not persuaded.

■ When ruling on a motion for judgment of acquittal, the trial court must determine whether the evidence, viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt. We may not disturb the trial court's ruling on such a motion absent an abuse of discretion. *People v. Jones*, 990 P.2d 1098 (Colo.App.1999).

■ To establish second degree murder, the People must prove that the victim's death was more than merely a probable result of the defendant's actions and that the defendant was aware of the circumstances that made the death practically certain. *People v. Baca*, 852 P.2d 1302 (Colo.App.1992).

■ A defendant's awareness of the circumstances that made the death practically certain may be inferred from the defendant's conduct and all of the surrounding circumstances. *People v. Hall*, 999 P.2d 207 (Colo.2000); *People v. Mingo*, 196 Colo. 315, 584 P.2d 632 (1978). The jury is entitled to consider such inferences and the weight to be given to them in determining whether the People have proved the required criminal intent beyond a reasonable doubt. *People v. Mingo, supra.*

■ Admittedly, here, much of the evidence was circumstantial, but in determining sufficiency the law makes no distinction between direct and circumstantial evidence. *People v. Bennett*, 183 Colo. 125, 515 P.2d 466 (1973); *see COLJI Crim.* No. 4:01 (1983).

■ Defendant was the last person seen with the victim, and according to the testimony of defendant's wife, he admitted striking

the victim in the throat. The pathologist testified that such a blow could have caused the death of the victim. The wife also testified that after the killing, defendant engaged in an elaborate cover-up of the victim's body, moving it several times, and finally burying it under a bridge after discarding the victim's clothing. He also forced his wife to move to New Mexico with him on very short notice, and she testified that he had recurring nightmares of ghosts that would "get him like he got [the victim]."

After they returned to Colorado, defendant went to the burial site three more times to ensure that it had not been disturbed, and a police detective testified that during the surveillance, he saw defendant drive to the location in which the body was later found. Defendant got out of his vehicle, looked around the area, and then drove away. After defendant's arrest, wife stated that he had called her, pressuring her to refuse to testify against him.

Viewing defendant's admissions, his conduct, and the surrounding circumstances in the light most favorable to the prosecution, *see People v. Osborne*, 973 P.2d 666 (Colo. App.1998), we conclude the jury could reasonably have inferred that the victim's death was not accidental and more than merely a probable result of defendant's actions, but rather, that defendant was aware of the circumstances that made the victim's death practically certain. *See People v. Baca, supra.*

Accordingly, we reject defendant's contention that his motion for judgment of acquittal should have been granted based on insufficient evidence.

## IV.

Defendant next contends the trial court erred when it instructed the jury on second degree murder and reckless manslaughter, but refused to instruct on the lesser included offense of criminally negligent homicide. We conclude any such error was harmless as a matter of law.

It is undisputed that reckless manslaughter and criminally negligent homicide are lesser included offenses of second degree murder. Second degree murder occurs when a person "knowingly causes the death of a person." Section 18–3–103(1), C.R.S.2000. Persons act knowingly with respect to conduct or circumstances defined as part of the offense when they are aware that their conduct "is of such nature or that such circumstance exists." Persons act knowingly with respect to a result of their conduct when they are aware that their conduct "is practically certain to cause the result." Section 18–1–501(6), C.R.S.2000.

 A person commits reckless manslaughter if he or she recklessly causes the death of another person. Section 18–3–104(1)(a), C.R.S.2000. A person acts recklessly when he or she consciously disregards a substantial and unjustifiable risk that a result will occur. *People v. Garcia*, 1 P.3d 214 (Colo.App.1999)(*cert. granted* May 22, 2000). In the commission of reckless manslaughter, the actor causes death by acting in a manner that involves a substantial and unjustifiable risk of death of the victim, and although the actor is conscious of the risk, he or she nevertheless chooses to engage in the action. *Moore v. People*, 925 P.2d 264 (Colo. 1996).

 Criminally negligent homicide is an unintentional killing caused by the actor's failure to perceive a substantial and unjustifiable risk that a certain result will occur. *People v. Castro*, 10 P.3d 700 (Colo.App. 2000). Under § 18–1–501(3), C.R.S.2000, a person acts with criminal negligence when

[t]hrough a gross deviation from the standard of care that a reasonable person would exercise, he fails to perceive a substantial and unjustifiable risk that a result will occur or that a circumstance exists.

Here, even if we assume the trial court erred in failing to instruct on criminally negligent homicide, we conclude that any such error was harmless as a matter of law because the jury found defendant guilty of the charged offense and rejected the lesser included offense of reckless manslaughter.

## A.

In analyzing the standard of review regarding the failure to give an instruction on a

lesser included offense, we initially observe that the majority of the federal circuits addressing the issue have held that the failure of a state court to instruct on a lesser included offense in a noncapital case *never* raises a federal constitutional question. *Pitts v. Lockhart*, 911 F.2d 109 (8th Cir.1990); *Valles v. Lynaugh*, 835 F.2d 126 (5th Cir.1988); *Chavez v. Kerby*, 848 F.2d 1101 (10th Cir. 1988). *See Beck v. Alabama*, 447 U.S. 625, 637, 100 S.Ct. 2382, 2389, 65 L.Ed.2d 392, 402 (1980)("we have never held that a defendant is entitled to a lesser included offense instruction as a matter of due process"); *People v. Sakarias*, 22 Cal.4th 596, 94 Cal. Rptr.2d 17, 995 P.2d 152 (2000)(trial court's failure to give lesser included offense should be analyzed under state law standard of prejudice, which is whether the error was harmless).

■ Hence, we conclude that the failure to give a lesser included instruction in this case is not subject to review under the constitutional standard of harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)(establishing harmless error standard where constitutional right has been violated).

In so holding, we acknowledge that *Gallegos v. People*, 136 Colo. 321, 316 P.2d 884 (1957), suggests the failure to give a lesser included instruction implicates a constitutional right, but *Gallegos* was decided before *Chapman v. California, supra*. Further, the supreme court did not mention *Chapman* or the harmless-beyond-a-reasonable-doubt standard when addressing the alleged instructional errors in *People v. Bartowsheski*, 661 P.2d 235 (Colo.1983); *People v. Shaw*, 646 P.2d 375 (Colo.1982); *People v. Favors*, 192 Colo. 136, 556 P.2d 72 (1976); and *People v. Mullins*, 188 Colo. 23, 532 P.2d 733 (1975).

In *People v. Romero*, 694 P.2d 1256, 1269 (Colo.1985) the supreme court also treated the defendant's failure to request a lesser included offense instruction as a waiver, stating: "[I]t may reasonably be assumed that he elected to take his chance on an outright acquittal or conviction of the principal charge rather than to provide the jury with an opportunity to convict on a lesser offense."

Because courts indulge every reasonable presumption against the waiver of fundamental constitutional rights, *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); *People v. Curtis*, 681 P.2d 504 (Colo. 1984), it is reasonable to infer that the court in *Romero* did not view the giving of a lesser included instruction as a fundamental state constitutional right.

### B.

There are two lines of cases, which appear to be inconsistent with each other, that have addressed the consequence of a trial court's failure to give a lesser included offense instruction. One line of cases has held that the trial court's refusal to instruct on a lesser included offense is reversible error if there is evidence, however slight, tending to establish the lesser included offense. *See People v. Shaw, supra.*

In *Shaw*, the defendant's charges included first degree murder and felony murder. The court instructed the jury on second degree murder, but refused to instruct on reckless manslaughter and criminally negligent homicide. After the jury found defendant guilty of second degree murder, he appealed and the supreme court held that the trial court's failure to instruct on the lesser included offenses required reversal.

However, other cases have held that the trial court's refusal to instruct on a lesser included offense may constitute harmless error.

In *People v. Favors, supra*, the defendant was charged with first degree murder and the trial court also instructed the jury on the lesser included offense of second degree murder, but refused to instruct on manslaughter. The jury convicted the defendant of first degree murder and defendant appealed. The supreme court concluded that any error by the trial court in refusing to instruct on manslaughter was harmless because the jury had convicted on the higher charge and had rejected the less serious offense of two alternatives. The court reasoned that:

> Failure to instruct on an even less serious offense than second-degree murder, in light of the jury's verdict for the most

serious possible offense, does not comport with an inference of prejudice and did not deny the defendant a fair trial.

*People v. Favors, supra,* 192 Colo. at 140, 556 P.2d at 75. *See People v. Mullins, supra;* see also *People v. Bartowsheski, supra.*

In *People v. Gordon,* 765 P.2d 633 (Colo. App.1988), the defendant was charged with second degree murder and a crime of violence. The trial court instructed the jury on second degree murder, heat of passion manslaughter, and criminally negligent homicide, but refused to instruct on reckless manslaughter. A division of this court reversed the conviction and ordered a new trial, concluding the jury should have been given the choice between second degree murder and reckless manslaughter.

The division in *Gordon* rejected the People's argument that the court's failure to instruct was harmless error and discussed the interplay among *Shaw, Favors,* and *Mullins:*

> The [People's] argument rests on the proposition that, because the jury rejected both of the lesser offenses on which it was instructed, it would undoubtedly have rejected the third also, had it been given that opportunity. *This would be an apt analysis in a case in which the jury has convicted a defendant of an offense higher than an included offense on which there was an instruction, and there is a still lesser included offense on which there was no instruction.* In such a case, the selection by the jury of the highest available grade of the offense constitutes a rejection of the next lower included offense and of all lesser offenses included within the latter.
>
> In both *Favors, supra,* and *Mullins, supra,* for example, the defendants were convicted of first-degree murder and the juries were also instructed on second-degree murder. Thus, the juries' selection of first-degree murder constituted a rejection of second-degree murder, carrying an implicit rejection of all offenses included in second-degree murder. In *Favors,* therefore, it was not prejudicial error to fail to instruct on criminally negligent homicide.
>
> . . .
>
> *The heart of the Favors rule is in the jury's rejection of a lesser included offense in which is included the offense on which there was no instruction.*

*People v. Gordon, supra,* 765 P.2d at 635 (emphasis added; citations omitted).

 The case before us presents the very circumstance that the panel in *Gordon* considered to be harmless error: the jury here convicted defendant of an offense (second degree murder) higher than an included offense for which there was an instruction (reckless manslaughter), and there was still a lesser included offense on which there was no instruction (criminally negligent homicide). Under the *Gordon* analysis, which reconciles *Shaw, Mullins,* and *Favors,* the selection by the jury of the highest available grade of the offense (second degree murder) constituted its rejection of the next lower included offense (reckless manslaughter) and of all lesser offenses included within the latter (here, criminally negligent homicide).

Stated differently, the jury here necessarily found that the People had proved beyond a reasonable doubt that defendant possessed the mental state required for second degree murder, which necessarily subsumed the mental state required for criminally negligent homicide.

We therefore conclude the trial court's failure to instruct the jury on criminally negligent homicide, even if erroneous, was harmless as a matter of law. *See People v. Favors, supra; People v. Mullins, supra; People v. Gordon, supra.*

## V.

Defendant next contends the trial court erred in denying his motions to dismiss and for a mistrial based on the People's opening and closing statements. We disagree.

### A.

 A prosecutor's opening statement is limited to the evidence that will be adduced at trial. *People v. Hernandez,* 829 P.2d 394 (Colo.App.1991). Nevertheless, re-

marks later proven unsupported by the evidence generally do not require reversal unless there is a showing of bad faith and manifest prejudice. *People v. Melanson,* 937 P.2d 826 (Colo.App.1996).

■■ Here, the prosecutor stated during opening statements that defendant had told his wife, "I killed someone. Grabbed her hair back and karate chopped her in the neck." The prosecutor also said defendant had told his wife that he had "buried the body and that he took spray paint and sprayed it on the body everywhere that he had touched the body to get rid of his finger-prints."

When the prosecution failed to present proof of either of these alleged facts during its case-in-chief, defendant moved for dismissal. The People conceded that defendant had never used the words "karate chop" and that they had failed to present evidence concerning the use of spray paint. Nevertheless, while the People's opening statements did contain two statements that were not proven at trial, which we do not condone, there was no showing of bad faith or manifest prejudice.

Accordingly, the trial court did not abuse its discretion in denying defendant's motion to dismiss.

### B.

■■ Defendant's motion for mistrial was based on the fact that the People referred to statements defendant made to his wife while the police were present. The defense contended that the trial court's suppression order precluded this evidence.

■■ A mistrial is a drastic remedy and is warranted only when the prejudice to the accused is so substantial that its effect on the jury cannot be remedied by other means. *People v. Salazar,* 920 P.2d 893 (Colo.App. 1996). Absent an abuse of discretion, a trial court's denial of a motion for mistrial will not be disturbed on appeal. *People v. Scott,* 10 P.3d 686 (Colo.App.2000).

Here, the trial court determined that its suppression order pertained only to statements that defendant had made to the police,

and did not include defendant's statements to his wife. Thus, we perceive no abuse of discretion by the court in denying the motion for a mistrial.

### C.

■■ We also reject defendant's contention that the trial court abused its discretion in permitting the prosecutor to argue evidence during her closing statement that was not admitted at trial.

■■ A prosecutor is entitled to comment on evidence admitted at trial and to argue all inferences that can be reasonably and fairly drawn from such evidence. *People v. Rodriguez,* 794 P.2d 965 (Colo.1990).

During closing arguments, the prosecutor stated that defendant had told his wife that "the ghosts are going to get me like I got her." Defendant objected on the ground that this statement was never introduced at trial, but the record reflects that this evidence was in fact elicited during the cross-examination of the wife. Accordingly, the prosecutor did not err in making this statement during the closing arguments.

### VI.

■■ Finally, defendant contends the trial court abused its discretion in admitting a photograph depicting the victim's decomposed body. We disagree.

Evidence is relevant when it tends to make the existence of any fact that is of relevance to the determination of an action more probable or less probable than it would be without the evidence. CRE 401. Irrelevant evidence is inadmissible. CRE 402. Relevant evidence may also be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. CRE 403.

■■ The Colorado Rules of Evidence strongly favor the admission of evidence, and the trial court has broad discretion in determining the admissibility of evidence. *See* CRE 403; *People v. District Court,* 869 P.2d 1281 (Colo.1994). When the defendant objects to photographic evidence on the basis that it is unfairly prejudicial, we review the trial court's decision only for abuse of discre-

tion. *People v. Scarlett,* 985 P.2d 36 (Colo. App.1998).

■ Photographs may be used to portray relevant matters, including the scene of the crime, the identification of the victim, the appearance and condition of the deceased, and the location, nature, and extent of the wounds or injuries. *See People v. Anderson,* 954 P.2d 627 (Colo.App.1997).

Here, over defendant's objection, the trial court admitted one photograph that showed the victim's body after it had been exhumed. Although the photograph was grisly, the trial court reasoned that the People should be allowed to present evidence explaining why it was difficult to determine the cause of death and why the coroner was unable to make conclusive findings. The court also advised the jurors that they were not required to look at the photograph. While we conclude the photograph had only marginal relevance, we cannot say the trial court abused its discretion in admitting it. *See People v. Anderson, supra.*

Judgment affirmed.

Judge ROY concurs.

Judge TAUBMAN dissents.

Judge TAUBMAN dissenting.

This case presents the issue of the appropriateness of instructing the jury on criminally negligent homicide in circumstances not previously addressed by any Colorado appellate court. I disagree, on both factual and legal grounds, with Part IV of the majority's opinion that failure to instruct the jury on the lesser included offense of criminally negligent homicide was not error. Instead, I conclude that because the *mens rea* for criminally negligent homicide concerns the failure to perceive a risk that harm could occur, it is fundamentally different from the *mens reas* for second degree murder and reckless manslaughter, and the jury should have been instructed on it as well. Therefore, I respectfully dissent.

The facts of this case are gruesome and tend to implicate the defendant, especially the events that occurred after the victim was killed. The majority opinion details many of those facts.

On appeal, defendant concedes that his actions caused the victim's death, but he argues that his actions were either justified as self-defense or that he is culpable only of criminally negligent homicide. Relying on testimony of the pathologist, who could not specify the cause of the victim's death, defendant contends that the victim died accidentally after he hit her in the neck or chest area. He argues that the trial court therefore erred by failing to instruct the jury on criminally negligent homicide, an offense that was consistent with his theory of the case, when there was a rational basis to support this instruction.

A court must give a lesser included offense instruction whenever there is a rational basis for the jury to acquit the defendant of the greater offense, but convict him or her of the lesser offense. *People v. Halstead,* 881 P.2d 401 (Colo.App.1994). In a homicide case, when there is some evidence, however slight, establishing the lesser included offense, it is reversible error to refuse to instruct the jury on that lesser offense. *People v. Shaw,* 646 P.2d 375 (Colo.1982).

Here, defendant was entitled to an instruction on criminally negligent homicide, because he presented evidence upon which a jury rationally could have acquitted him of second degree murder and reckless manslaughter, and still convicted him of criminally negligent homicide. *See People v. Halstead, supra.*

Specifically, criminally negligent homicide was consistent with his defense that he did not knowingly or consciously disregard a known risk that his actions would cause death, but rather, that he failed to perceive the risk that hitting the victim in the throat or chest area could cause death. Defendant never disputed that he hit the victim in the neck or chest area and that such blow caused her death. Rather, he argued that either her death was accidental because he did not know that she could die from such a blow, or that his actions were justified by the affirmative defense of self-defense.

Further, defendant's request for an instruction on criminally negligent homicide was not inconsistent with his affirmative defense of self-defense. *See People v. Castro,* 10 P.3d 700 (Colo.App.2000)(jury was properly instructed on both self-defense and criminally negligent homicide, because the self-defense instruction applied only to second degree murder and not to criminally negligent homicide). Here, the self-defense instruction applied to second degree murder, but did not apply to reckless manslaughter and would not have applied to criminally negligent homicide.

On the night of the offense, defendant and the victim attended a party. The prosecution presented conflicting testimony about the events leading up to the victim's death, and defendant, through the testimony of his ex-wife, presented different accounts as well.

At trial, defendant's request for an instruction on criminally negligent homicide was supported by the testimony of his ex-wife and the testimony of the forensic pathologist who performed the autopsy of the victim.

Thus, defendant's ex-wife testified that defendant repeatedly told her that the victim's death was an accident. According to her, defendant gave four versions of the accident, at least three of which were consistent with criminally negligent homicide. Three or perhaps four of the versions involved defendant hitting the victim in the neck or chest area at the party or in a park. The ex-wife further testified that defendant said he did not realize that he had killed the victim, but rather, thought that she had passed out after he had hit her. In my view, the conflicts in the four versions as to where the victim died are not relevant to the question whether a rational basis exists upon which a jury could acquit defendant of the greater crimes and convict him of criminally negligent homicide. Regardless of where the victim was killed, the jury may have believed that defendant's actions constituted a failure to perceive a risk that injury could occur.

Additionally, the forensic pathologist testified that the victim could have died from a blow to her neck or chest area. He testified that humans have a reflex action, and when hit in the neck or chest area, this reflex action may cause a person to drop dead immediately. He explained that people have bundles of nerves in their necks that control breathing, heartbeat, and the majority of body functions. Trauma to those nerves can cause death quickly. The forensic pathologist further explained that there are multiple causes for this reflex action, including a blow to the neck or chest area with a fist or an open palm. Although he initially testified that the blow must have been hard to be fatal, on cross-examination, the pathologist conceded that such a blow did not have to be hard for it to be fatal.

It is important to note that the forensic pathologist could not determine the exact cause of death; rather, he was only able to rule out various causes of death. He testified that the victim had not been shot or stabbed, had not suffered a stroke, had not broken any bones, and had not been hit in the head.

The forensic pathologist also testified that he had performed over 4,000 autopsies, nearly 1,000 of them forensic, and had never seen a case where blunt trauma to the neck or chest caused death.

Because death occurs so rarely from this type of trauma, the pathologist's testimony is entirely consistent with defendant's theory of the case that the victim died as a result of an accident. Indeed, during closing argument the prosecutor asserted, based on the pathologist's testimony, that the most likely cause of death of the victim was a blow to the neck or chest area.

The forensic pathologist's testimony and the prosecution's closing argument thus support giving a jury instruction on criminally negligent homicide, because they demonstrate that defendant could easily have failed to perceive that hitting the victim in the neck or chest area, even intentionally, would have caused her death.

Further, the trial court's failure to instruct the jury on criminally negligent homicide was particularly prejudicial here, because the prosecution did not have overwhelming evidence supporting a conviction for second degree murder. There was no direct or physical evidence linking defendant to the crime,

and the People's entire case was based on circumstantial evidence of events before and after the crime. Moreover, twice, the jury informed the court that it was "hopelessly deadlocked" and asked for instructions on how to proceed. Both times, the court responded that the jury must continue deliberations. The verdict was eventually returned after 5:00 p.m. on a Friday.

In these circumstances, and notwithstanding the extent of testimony tending to incriminate defendant, the testimony from the pathologist and defendant's ex-wife, if believed by the jury, was sufficient to present a rational basis for acquitting defendant of second degree murder and reckless manslaughter and convicting him of criminally negligent homicide. In my view, defendant's degree of culpability was a jury question.

Accordingly, I must consider whether the court's failure to instruct the jurors on criminally negligent homicide was harmless error.

Harmless error is any error that does not affect a substantial right of a party. Crim. P. 52(a). Thus, when an error affects a substantial right of a party, it cannot be deemed harmless. *People v. Pratt,* 759 P.2d 676 (Colo.1988).

The majority opinion concludes that either there was no error or that any error was harmless. I conclude, however, that the court erred and that such error was not harmless.

In concluding that the failure to instruct on criminally negligent homicide was not error, the majority analyzes two lines of cases. I disagree with its analysis under the unique circumstances presented here.

The majority asserts that, under one line of cases, a trial court's failure to instruct a jury on a lesser included offense is reversible error. *See People v. Shaw, supra.* Under the other line, by convicting a defendant of the greater offense, and rejecting a lesser included offense, the jury impliedly rejects all other lower lesser included offenses as well. Under that line, the failure to give such an instruction is harmless error. *See People v. Favors,* 192 Colo. 136, 556 P.2d 72 (1976); *People v. Mullins,* 188 Colo. 23, 532 P.2d 733 (1975).

According to the majority, *People v. Gordon,* 765 P.2d 633 (Colo.App.1988), reconciles these divergent lines of cases. In *Gordon,* a division of this court held that, when a jury convicts a defendant of an offense higher than an included offense on which there was an instruction, and there remains an even lesser included offense on which there was no instruction, the error is harmless because the selection of the higher offense constitutes a rejection of all lesser included offenses.

Applying *Gordon* to the facts presented here, the majority concludes that the jury's conviction of defendant for the highest offense, second degree murder, and rejection of the lesser included offense of reckless manslaughter, necessarily constituted a rejection of the next lower included offense of criminally negligent homicide, even though the jury was not instructed as to that offense.

However, *Gordon* is distinguishable because the division there did not compare the *mens reas* for second degree murder and reckless manslaughter, on the one hand, and criminally negligent homicide, on the other. No Colorado appellate court opinion has examined the need for a lesser included offense instruction based upon the different *mens reas* involved, but, in my view, that distinction is significant.

The *mens reas* for the three offenses raised in this situation vary considerably, and given all three options, a jury might well convict defendant of criminally negligent homicide and acquit him of the two greater offenses.

Second degree murder occurs when a defendant "knowingly causes the death of a person." Section 18–3–103(1), C.R.S.2000. A person acts knowingly with respect to the result of his or her conduct when he or she is aware that the conduct is "practically certain to cause the result." Section 18–1–501(6), C.R.S.2000.

A defendant commits reckless manslaughter by acting in a manner that involves a substantial and unjustifiable risk of death to the victim, and although the defendant is aware of the risk, he or she nevertheless chooses to engage in the action that causes

death to the victim. *See Moore v. People,* 925 P.2d 264 (Colo.1996).

Both second degree murder and reckless manslaughter thus require that a defendant be aware of the risk associated with his or her actions. However, criminally negligent homicide does not require such awareness; rather, it occurs when a defendant *fails to perceive* a substantial and unjustifiable risk that an unintentional death will occur as a result. *See People v. Castro, supra.* Thus, the distinction between the *mens reas* of the offenses is critical here.

The circumstances presented in both *People v. Favors, supra,* and *People v. Mullins, supra,* were different from those here, in that there, each defendant was charged with first degree murder and the jury was instructed only on first and second degree murder. *Mullins* did not discuss the impact of the *mens reas* involved, nor did it address a court's failure to instruct a jury on criminally negligent homicide.

Although the defendant in *Favors* argued that the trial court erred in not instructing the jury on criminally negligent homicide as a lesser included offense, the supreme court concluded that the defendant's tendered instruction incorrectly stated the law and that the defendant had not demonstrated prejudice. Therefore, the *Favors* court did not address the *mens rea* for criminally negligent homicide, the issue presented here.

Relying upon *Gordon,* the majority concludes that, because the jury here convicted defendant of second degree murder rather than reckless manslaughter, it would not have acquitted him of second degree murder and convicted him of criminally negligent homicide.

However, as shown above, *Gordon* is distinguishable, and regardless of the instructions given on greater offenses, defendant here was entitled to an instruction on criminally negligent homicide because there was evidence that could have lead a reasonable jury to convict him of that offense and acquit him on the greater offenses. *See People v. Shaw, supra; People v. Palumbo,* 192 Colo. 7, 555 P.2d 521 (1976)(where the defendant hit the victim, causing him to fall and fatally strike his head, the trial court did not err in instructing the jury on criminally negligent homicide).

In addition, the trial court's rationale for rejecting defendant's request for an instruction on criminally negligent homicide was flawed. The court found that because defendant's actions were affirmative, and not negligent, criminally negligent homicide did not apply. However, the trial court was mistaken because an affirmative act is not inconsistent with criminally negligent homicide, which involves the failure to perceive a risk. Thus, an affirmative action on the part of defendant would not preclude the court from instructing the jury on criminally negligent homicide. In fact, defendant's affirmative act of striking the victim here is consistent with the *mens rea* for criminally negligent homicide, because his contention is that he failed to perceive the risk that the victim might die from such affirmative act.

Thus, I cannot conclude that the trial court's failure to instruct the jurors on criminally negligent homicide was harmless because defendant's substantial rights were affected. Had the jury been instructed on criminally negligent homicide, it may well have convicted defendant of that charge and acquitted him of second degree murder and reckless manslaughter. Accordingly, I would reverse defendant's conviction and remand for a new trial.

In addition, I agree with the majority's resolution of Parts I and II. Because I disagree with Part IV, I would not reach the issues addressed in Parts III, V, and VI of the majority's opinion, which would be unlikely to recur on retrial.